UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION** at **LEXINGTON**

|                                          |     |                                              |
| ---------------------------------------- | --- | -------------------------------------------- |
|                                          | )   |                                              |
|                                          | )   | MDL. No. 1877                                |
|                                          | )   |                                              |
| IN RE CLASSICSTAR MARE LEASE             | )   |                                              |
| LITIGATION                               | )   | Master File:                                 |
|                                          | )   | Civil Action No.                             |
|                                          | )   | 5:07-cv-353-JMH                              |
|                                          | )   |                                              |
| and                                      | )   |                                              |
|                                          | )   |                                              |
| J&L CANTERBURY FARMS, LLC,               | )   |                                              |
| *et al.,*                                | )   |                                              |
|                                          | )   |                                              |
| Plaintiffs,                              | )   | Civil Action No.                             |
|                                          | )   | 5:07-cv-349-JMH                              |
|                                          | )   |                                              |
| V.                                       | )   |                                              |
|                                          | )   |                                              |
| CLASSICSTAR, LLC, *et al.,*              | )   |                                              |
|                                          | )   |                                              |
| Defendants.                              | )   |                                              |

**MEMORANDUM OPINION AND ORDER**

**\*\*\* \*\*\* \*\*\***

## I. STATEMENT OF FACTS

All told, Plaintiffs invested $10.5 million in Mare Lease Programs offered by ClassicStar, LLC, and touted as an easy way to enter into the thoroughbred industry. 2d Am. Compl. ¶¶ 27-28, 176. ClassicStar had a shortage of thoroughbred mares to support its sales of ClassicStar Mare Leases, but, notwithstanding these shortages, Forman and the Plummers along with other RICO defendants, continued to market and sell Mare Leases to

unsuspecting investors, including Plaintiffs. 2d Am. Compl. at ¶¶ 65-85.

In November of 2003, Plaintiffs invested roughly $6 million in Mare Lease Programs. *Id*. at ¶ 81. In order to disguise the fact that there were insufficient mares available, three months later, in February, 2004, GeoStar Corporation, acting in concert with the other RICO defendants, offered to purchase the Plaintiffs' 2003 Mare Lease Program in exchange for Gastar stock; the offer contained a guaranteed put option, by which the Plaintiffs would be guaranteed a minimum profit of $2,000,000 by January 1, 2007. *Id*. at ¶ 92. In March, 2004, the Plaintiffs agreed to sell their mare leases to GeoStar in exchange for Gastar stocks, an arrangement that took effect in August, 2004. *Id*. at ¶ 96, 103. At the same time, Plaintiffs agreed to purchase another set of Mare Leases, ultimately investing an additional $4.5 million in the Program in December, 2004. *Id*. at ¶ 113.

Three months later, in March, 2005, some of the defendants asked the Plaintiffs if they would be willing to exchange their Mare Lease Programs for outright ownership interests in male and female quarter horses. *Id*. at ¶ 114. In order to overcome the Plaintiffs' reluctance to exchange their leasehold interests in thoroughbred horses for ownership interests in quarter horses, the ClassicStar Defendants offered a "put" option on the quarter horse interests, effective July 1, 2007, whereby ClassicStar would

2

repurchase the horse interests for $4.95 million, which represented a 10% profit to the Plaintiffs. *Id*. at ¶ 117. In March, 2005, the Plaintiffs entered into an agreement whereby they exchanged their Mare Leases for ownership interests in quarter horses. *Id*. at ¶ 118. The agreement was signed by Spencer Plummer. ClassicStar and the Plummers represented that the quarter horses were being cared for by the Plummers at their ranch located in Utah. *Id*. at ¶¶ 121, 144.

Notwithstanding their knowledge that the Plaintiffs were the owner of the horses as a result of their agreement, the Plummers subsequently sold the quarter horses. *Id*. at ¶ 148. This was all part and parcel of the scheme to churn the Mare Leases so that investors would not uncover the fact that ClassicStar did not have sufficient mares to support the number of leases it was selling. Once an investor entered into the investment scheme by purchasing a Mare Lease, the RICO defendants counseled the investor to sell their Mare Leases in return for a different investment. *Id*. at ¶¶ 92-95; see also Plummer's Cross-Claims at ¶ 34, 39, attached as Exhibit "A." Once the Mare Lease interests were exchanged for the other investments, the many defendants, including investment advisors Wilmington Trust, PCG, and Forman would then urge investors to purchase more Mare Lease Programs, purportedly to retain the tax benefits of investing in the thoroughbred industry. Id. at ¶¶ 106-08. Plaintiffs allege that all of these defendants

acted with knowledge of the unsustainability of the leasing program due to a shortage of breeding pairs.

## II.  Standard of Review and Applicable Law

In evaluating a Rule 12(b)(6) motion, the factual allegations of the Complaint "must be enough" that the right to relief is "above the speculative level" and is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If the complaint pleads facts "merely consistent with" liability, it "stops short of the line between possibility and plausibility of entitlement to relief." *Id*. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

"When analyzing questions of federal law, the transferee court should apply the law of the circuit in which it is located." *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 97 F.3d 1050, 1055 (8th Cir. 1996). "When considering questions of state law, however, the transferee court must apply the state law that would have applied to the individual cases had they not been transferred for consolidation." *Id*. In this instance, that is the law of the Commonwealth of Pennsylvania.

## III. Discussion

### A. RICO and the PSLRA

As an initial matter, the Court rejects Forman and the Plummers' argument that § 107 of the Private Securities Litigation Reform Act bars Plaintiffs' RICO claims.

As amended by the PSLRA, the RICO statute provides:

> (c) [a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, *except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.. . .*

18 U.S.C. § 1964(c) (emphasis added). "[T]he proper focus of the analysis is on whether the conduct pled as predicate offenses is 'actionable' as securities fraud – not on whether the conduct is 'intrinsically connected to, and dependent upon' conduct actionable as securities fraud." *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 330 (3d Cir. 1999).

Here, the Hertzogs allegedly accepted the exchange of their 2003 Mare Lease Program for what was explained to them as a commensurate amount of Gastar stock (with a put option that provided a cash payment to Plaintiffs) and then were immediately advised that, to preserve their tax benefits, they had to reinvest in the Mare Lease Program. 2d Am. Compl. ¶ 93. They subsequently exchanged their 2004 Mare Lease Program for ownership of quarter horses, a non-security. 2d Am. Compl. at ¶ 118. Plaintiffs describe

the conduct at issue in this case as the "churning" of Mare Leases which required the availability of alternative investments. The movants argue that the alternative investments referred to in the Second Amended Complaint were shares of Gastar stock, but Plaintiffs' Second Amended Complaint actually avers that a wide variety of alternative investments were offered to investors, included ownership of quarter horses. *Id*. at ¶¶ 114-120, 130. The Court agrees that, on these facts, the fact that some of the alternative investments were securities was incidental to the scheme and to the conduct that forms the basis of the complaint. Notably, Plaintiffs made a second purchase of a Mare Lease Program and subsequent exchange of those interests for quarter horses without relying upon any conduct related to the ClassicStar Defendants' failure to provide Gastar stock.

The central focus of the Mare Lease Marketing Enterprise was to sell Mare Leases, and to continue to sell Mare Leases despite having exceeded the limit of Mare Leases that could feasibly have been sold given ClassicStar's inventory of mares. The movants do not argue that this constitutes securities fraud. Rather, what is important for purposes of this analysis is that the only way to keep this many-tiered scheme alive was to convince Mare Lease investors to accept alternative investments that were touted as having the same -- or greater -- value as the Mare Leases. Once

the investors agreed to accept alternative investments, they were immediately cycled back into the Mare Lease Marketing Enterprise.

Thus, the case before the Court is unlike that in *Bald Eagle* in which the Third Circuit applied the PSLRA to bar RICO claims "implicating" securities. The fraudulent scheme in *Bald Eagle* was entirely securities-driven and was, in fact, brought to light by the Securities and Exchange Commission's civil enforcement action. The plaintiffs attempted to circumvent the PSLRA by pleading only those predicate acts that were not directly actionable as securities fraud. Thus, the Court held that "a plaintiff cannot avoid the RICO Amendment's bar by pleading mail fraud, wire fraud and bank fraud as predicate offenses in a civil RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud." *Bald Eagle*, 189 F.3d at 330.

Neither Forman nor the Plummer Defendants allege that the sale of Mare Leases constitutes the sale of securities or that the underlying fraud in the sale of the Mare Leases (too many leases for too few horses and the misrepresentation of the program to meet demand) constitutes security fraud. Rather, they allege that because one of the Plaintiffs' Mare Lease Programs was exchanged for a contract to deliver shares of Gastar stock (which have never been provided to plaintiffs), the entirety of the RICO claims are barred as this one exchange may constitute actionable securities fraud. The Court sees no reason to apply the bar on these facts.

*See Sec. and Exchange Comm. v. Zandford*, 535 U.S. 813, 820 (2002) (holding that the language in §10(b) of the Securities Exchange Act and Rule 10b-5 prohibiting fraud "in connection with the purchase or sale of any security" must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of the Act).

Even if a securities transaction took place and co-defendant GeoStar misrepresented its intent to transfer stock to the Plaintiffs, this is not the principal fraud being alleged under civil RICO, and that the presence of a securities transaction is highly incidental to the fraud that has been perpetrated. *See Petters Co., Inc. v. Stayhealthy, Inc*., No. Civ. 03-3210, 2004 WL 1465830 (D. Minn. June 1, 2004) (declining to apply securities fraud exception to bar RICO claims where the connection between the alleged fraud and securities transaction was tenuous at best).

**B.    § 1962(c) Claims Are Otherwise Properly Pleaded**

**1. Predicate Acts and Racketeering Activity**

Per 18 U.S.C. § 1961(1), both mail fraud and wire fraud are the type of "racketeering activity" that comprises a predicate act. *See Sedima, S.P.R.L. v. Imrex Co., Inc*., 473 U.S. 479, 495 (1985). 18 U.S.C. § 1961(5) states that a pattern of racketeering activity requires at least two acts of racketeering activity. As against Forman, the Plaintiffs have sufficiently pleaded a pattern of racketeering activity.

Under both the mail and wire fraud statutes, in order to state a violation, it is necessary to show (1) a scheme to defraud, (2) participation by the defendant in the scheme, (3) specific intent to defraud, and (4) the use of the United States wires or mails in furtherance of the scheme. *See United States v. Burks*, 867 F.2d 795 (3d Cir. 1989) (defining mail fraud); *United States v. Turner*, 465 F.3d 667 (6th Cir. 2006) (same); *see also In re Phillips Petroleum Secs. Litig.*, 881 F.2d 1236, 1249 (3d Cir. 1989) ("[T]he same elements provide the basis for both mail fraud and wire fraud[.]"); *Berent v. Kemper Corp.*, 973 F.2d 1291 (6th Cir. 1992) (same).

When pleading wire and mail fraud as predicate acts, a plaintiff must follow the heightened pleading requirements of Fed. R. Civ. P. 9(b), which requires the plaintiff to plead "the who, what, when, and where details of the alleged fraud." *Allen Neurosurgical Assoc., Inc. v. Lehigh Valley Health Network*, No. Civ. A. 99-4653, 2001 WL 41143 *3 (E.D. Pa. Jan, 18, 2001) (citing *United States ex rel. Waris v. Staff Builders, Inc.*, No. Civ. A. 96-1969, 1999 WL 179745, at *4 (E.D. Pa Mar. 4, 1999); *Bender v. Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir. 1984). ("To satisfy FRCP 9(b), a plaintiff must at minimum allege the time, place and contents of the misrepresentation(s) upon which he relied."). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

In this instance, Plaintiffs have clearly pleaded facts setting forth Forman's involvement in the overall scheme and the "who, what, when, and where details" of the predicate acts sounding in wire or mail fraud. These acts need not be fraudulent on their face, and even completely innocent mailings can satisfy the mail fraud statute because

> [t]he actual violation is the mailing, although the mailing must relate to the underlying fraudulent scheme. Moreover, each mailing that is "incident to an essential part of the scheme" constitutes a new violation. The mailing need not contain any misrepresentations. Rather, "innocent" mailings--ones that contain no false information--may supply the mailing element.

*Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1413-14 (3d Cir. 1991); *see also Henderson v. United States*, 202 F.2d 400, 404 (6th Cir. 1953) ("A scheme to defraud, within the meaning of the statute, may exist although no misrepresentation of fact is made."). "The scheme need not be fraudulent on its face, . . . but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir. 1978); *United States* v. Moore, 29 Fed. Appx. 222, 225, 2002 WL 74452, *2 (6th Cir. 2002) ("The standard for determining whether such proof has been presented is not a 'technical' one, but is 'a reflection of moral uprightness, fundamental honesty, fair play and right dealing in the general

and business life of members of society.' What is required is a showing of 'some sort of fraudulent misrepresentations or omissions.'" (*citing United States v. Van Dyke*, 605 F.2d 220, 225 (6th Cir. 1979)).

Plaintiffs aver that Forman's acts were a part of the overall scheme to defraud. Taken both individually and as a whole, Forman's own wire and mail communications – not to mention those sent by others as part of the same scheme– contain a number of omissions, chief of which is the fact that the Mare Lease Program was being marketed as if it had an unlimited source of mares to lease when it did not.  Each was designed to serve the underlying Mare Lease Marketing Program scheme – to keep it going even though it was unsustainable through a shell game cycle of continuing investments. Plaintiffs claim with adequate particularity that the defendants were, in their scheme, selling far more Mare Leases than ClassicStar's ownership of mares could possibly justify. If Forman provided only the information that would tend to indicate that the investment was both sound and lucrative while aware of and omitting the information that potential investors like Plaintiffs really needed in order to make an informed decision, that is enough for their claims against him to meet the plausibility standard of *Twombly* and *Iqbal* and survive Forman's motion to dismiss on these grounds.

**2. Pattern and Continuity**

11

The same is true with regard to his arguments about the sufficiency of Plaintiffs' pleadings as to "pattern" and "continuity." With respect to a "pattern" of racketeering activity, the Supreme Court has held that "[t]he term 'pattern' itself requires the showing of a relationship between the predicates . . . and of 'the threat of continuing activity'[.] . . . It is this factor of continuity plus relationship which combines to produce a pattern." *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989) (quoting the Congressional Record, 116 Cong. Rec., at 18940 (1970)). Continuity can be open-ended or closed-ended. Closed-ended continuity is defined as "a closed period of repeated conduct" and normally takes place over an extended period of time. *Id*. at 241-42. However, when a RICO action is brought before such an "extended period of time" can transpire, continuity may be established by a clear showing that the conduct that forms the basis of a RICO action may be "project[ed] into the future with the threat of repetition:" open-ended continuity. *Id*. at 241.

The Court concludes that the facts averred in Plaintiffs' Second Amended Complaint about Forman's participation demonstrate an open-ended continuity. Notably, as soon as the Plaintiffs exchanged their 2003 Mare Leases for an alternate investment, Forman immediately began pressuring the Plaintiffs to purchase another set of Mare Leases in 2004. 2d Am. Compl. ¶ 107. One can

project that, had the scheme not fallen apart, Forman would have been involved in selling the Plaintiffs 2005 Mare Leases while knowing that the program was unsustainable and continued only by "churning" investments to cover up the lack of breeding pairs, assuming he continued to be involved. His role may be more limited than the other defendants, but the overall scheme and his active participation while involved fits the definition of a "pattern" of racketeering activity.

On June 27, 2003, Forman provided Wilmington Trust with the "Illustrations" that laid out the Plaintiffs' potential investment amounts in the Mare Lease Program and their potential return on investment. 2d Am. Compl. ¶ 57. Forman met with the Plaintiffs, their advisors, Wilmington Trust advisors and Spencer Plummer on July 10, 2003 to make a PowerPoint presentation on the Mare Lease Program investments. 2d Am. Compl. ¶ 63. PCG, through Forman and others, remained involved in the Plaintiffs' investment throughout the life of the scheme. Forman accompanied the Hertzogs to meetings at ClassicStar headquarters to discuss the investment several times during 2003. 2d Am. Compl. ¶ 65(c). Forman affirmatively represented to the Plaintiffs that he would stay involved with their investment and assist them along the way. 2d Am. Compl. ¶ 65(h). Forman and Alan Gottlob, identified on PCG's website as recently as November 2, 2007 as a "managing director" and "founding partner" of PCG, accompanied Leo Hertzog, along with

representatives of Wilmington Trust, to the Keeneland Yearling Sales in Kentucky from September 6, 2003 to September 9, 2003. This trip also included a visit to the ClassicStar farms. 2d Am. Compl. ¶ 73. The Plaintiffs attended sales presentations with the Plummer defendants, Forman, Gottlob, and a representative of GeoStar on October 24, 2003. 2d Am. Compl. ¶ 85. In April, 2004, after the Plaintiffs had agreed to exchange their interests in Mare Leases for Gastar stock, they met with Forman and Gottlob on April 29, 2004 to discuss making another investment in the Mare Lease Program. 2d Am. Compl. ¶ 107. On June 7, 2005, Forman emailed representatives of ClassicStar to request that they compile information on the 2004 Mare Lease Programs for Hertzog, in effect, acting as the go-between for the Plaintiffs and ClassicStar. 2d Am. Compl. ¶ 161(f)(viii). Forman was involved continuously in the Mare Lease Marketing Enterprise from at least June, 2003 until at least June 7, 2005 - a period of two years. This is enough.

### 3. Enterprise

The Court also rejects Forman's argument that the parties have not properly averred an "enterprise" for the purposes of the RICO statute and his suggestion that Plaintiffs have failed to plead a violation of Section 1962(c) because the Plaintiffs did not sufficiently allege that he participated in the "operation or management" of the enterprise. An enterprise "includes any individual, partnership, corporation, association, or other legal

entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In order to prove an enterprise, a court requires proof "(1) that the enterprise is an ongoing organization with some sort of framework for making or carrying out decisions; (2) that the various associates function as a continuing unit; and (3) that the enterprise be separate and apart from the pattern of activity in which it engages." *United States v. Urban*, 404 F.3d 754, 770 (3d Cir. 2005); *see also VanDenBroeck v. CommonPoint Mortg. Co.*, 210 F.3d 696, 699 (6th Cir. 2000). In order to demonstrate that a party was involved in the operation or management of an enterprise, "[t]here must be a nexus between the person and the conduct in the affairs of an enterprise. The operation or management test goes to that nexus. In other words, the person must knowingly engage in 'directing the enterprise's affairs' through a pattern of racketeering activity." *University of Maryland at Baltimore v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir. 1993).

In their Second Amended Complaint, the Plaintiffs adequately plead the existence of an enterprise. This enterprise, termed the "Mare Leasing Marketing Enterprise," is an association in fact. Through their description of the predicate acts undertaken by each defendant, as well as through the factual recitation of how each defendant worked to draw the Plaintiffs into the scheme, incorporated by reference into Count I of the Second Amended

Complaint, the Plaintiffs sufficiently demonstrate that the enterprise is an ongoing organization with a consensual decision-making structure. 2d Am. Compl. ¶ ¶ 167-69. The enterprise made decisions by consensus, as evidenced by the assembly-line style by which potential investors were moved through the Mare Lease Marketing Enterprise. PCG and Forman worked with private investment firms, namely Wilmington Trust, to target wealthy individuals who would be interested in investments such as the Mare Lease Program. ClassicStar and the Plummers managed the horses. GeoStar offered investors alternative investments to keep the scheme alive. The enterprise as a whole decided whom to target, how to approach the investors, and what combination of information and in-person marketing pressure would be used to sell the Mare Leases to the individuals. In addition, the enterprise as a whole decided when to switch investors to alternative investments, which investments to offer, and what value to assign to the alternative investments.

Plaintiffs aver that "Wilmington Trust, PCG, and Forman participated in and were responsible for locating investors for marketing the Mare Lease interest and for advising investors to switch to alternative investments." 2d Am. Compl. ¶ 169. For example, on July 10, 2003, Forman, Coccetti and Wolf of Wilmington Trust, Plummer from Classicstar, and Leo Hertzog met to discuss the Mare Lease Programs. Wolf and Coccetti attended as the

Plaintiffs' financial advisors. Forman, on behalf of the enterprise, made a PowerPoint presentation which included an array of graphs, spreadsheets, and charts, which presented the Mare Leases as profitable and possessed of great financial potential. Plummer spoke last, reiterated the points made by Forman, and explained to Hertzog that only a select few were chosen to invest in the Mare Lease Program. Plummer told Hertzog that if the Plaintiffs invested, they would become part of an elite group. 2d Am. Compl. ¶ 63. The coordinated effort put forth in this meeting shows the consensual nature of the enterprise's decision-making structure; each member had a role to play, each had a level of control over the marketing of the program to the Plaintiffs, and the meeting itself was collaboratively orchestrated beforehand to achieve the maximum effect on Leo Hertzog.

In addition, when targeting the Plaintiffs to exchange their Mare Lease interests for Gastar stock, the ClassicStar defendants and Ferguson arranged a golfing outing for Leo Hertzog to the Augusta National Golf Club. During this trip, they discussed the exchange of the Mare Leases for Gastar stock. Coccetti of Wilmington Trust advised Hertzog that such a conversion was a prudent arrangement. Once Hertzog had agreed to convert his interests into Gastar stocks, Forman and Alan Gottlob met with him to discuss reinvesting in the Mare Lease Program. These examples show how the Enterprise worked in concert, collectively, and with

a group decision structure. Further, Forman, through his role in contacting other investors and investment companies to market the Mare Lease Marketing Enterprise, certainly had involvement in directing the enterprise; his role was to funnel investors into the program, which he did actively and with success, clearly establishing a nexus between Forman and the conduct of the enterprise's affairs

### 4. Conspiracy

Finally, in order to prove a conspiracy under 1962(d), a plaintiff must show that (1) there was an agreement to commit the predicate acts of fraud, and (2) defendants had knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate §§ 1962(a), (b) or (c). *Stursberg v. Todi*, No. Civ. A. 04-1333, 2004 WL 2244539 *6 (E.D. Pa. 2004). Plaintiffs aver that PCG and Forman were entitled to 7% of the total proceeds of the Mare Leases sold to the Plaintiffs, demonstrating that an agreement existed between the parties to parcel out responsibilities and profits from the scheme, 2d Am. Compl. ¶ 36, and have demonstrated throughout the pleading that Forman was aware of the illegality of the scheme -- particularly illustrated by his involvement in cycling the Plaintiffs back into purchasing more Mare Leases in 2004 after they had converted their first Mare Leases into alternative investments. 2d Am. Compl. ¶ 107. This, combined with all of the other facts about Forman's

participation in the scheme as averred, is sufficient to plead a RICO claim under subsection (c) but also that Forman was actively engaged – conspiring with – the other persons involved and agreed to further the scheme by marketing the Mare Leases to investors, purporting to offer "independent" investment advice, and actively persuading investors to switch to alternative investments.

### C. State Law Claims

Having decided that Plaintiffs' claims are not barred by Section 107 of the PSLRA and that they are adequately pleaded under the civil RICO statute itself, the Court will continue to exercise supplemental jurisdiction over any state law claims arising from the same underlying facts as the RICO claims.

#### 1. Unjust Enrichment

With respect to Plaintiffs' state law claims, the Court rejects the Plummers' argument that the Second Amended Complaint fails to state a claim for unjust enrichment because it does not allege that either of the Plummer possesses "funds" belonging to the Plaintiffs. As the Plummers set forth, the elements of unjust enrichment are: (1) a benefit conferred on the defendant by the plaintiff; (2) appreciation of that benefit by the defendant; and (3) retention of that benefit under circumstances that would be inequitable without payment to the plaintiff for the value therefore. *Commerce Bank/Pa. v. First Union Nat'l Bank*, 911 A.2d 133, 143 (Pa. Super. 2006). Plaintiffs obtained horses when Spencer

Plummer, acting on behalf of ClassicStar, signed the agreement exchanging Plaintiffs' 2004 Mare Lease Program for quarter horses, located at the Plummers' ranch in Utah, known as the Buffalo Ranch. 2d Am. Compl. at ¶¶ 143-44. The Plummers then purportedly cared for the quarter horses on plaintiffs' behalf. Id. at ¶ 144. However, the Plummers subsequently sold the horses and they have retained those proceeds. Id. at ¶ 148. This is enough, and the Second Amended Complaint adequately alleges a claim for unjust enrichment.

### 2. Fraud and Negligent Misrepresentation

The Court also rejects Forman's argument that Plaintiffs' fraud claim fails because Plaintiffs have not pleaded his knowledge "that the Mare Leasing Marketing Enterprise was selling an infinite number of Mare Leases." They do not need to as knowledge may be pleaded generally. *See* Fed. R. Civ. P. 9(b). The issue of what he knew and when will wait for another day. So, too, will proof of whether he knew or should have known the fraudulent purpose behind the Mare Lease Marketing Program for purposes of Plaintiffs' negligent misrepresentation claim.

### 3. Conspiracy

Finally, the Court is not persuaded that Plaintiffs' state law conspiracy claim must fail because Plaintiffs' have not averred that he acted with malice in pursuit of the conspiracy. In order to state a civil action for conspiracy, a complaint must allege

(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage. *Goldstein v. Phillip Morris, Inc.*, 854 A.2d 585, 590 (Pa. Super. 2004). When a trier of fact evaluates the underlying cause of action for fraud in which he might have conspired, that will determine whether he acted with malice. *See Pelagatti v. Cohen*, 536 A.2d 1337, 1341-42 (Pa. Super. 1987).

**IV. CONCLUSION**

Accordingly, for all of the reasons stated above, **IT IS ORDERED** that Forman and the Plummers' Motions to Dismiss [DE 26 and 31] are **DENIED**.

This the 19th day of January, 2019.



Signed By:

*Joseph M. Hood*

Senior U.S. District Judge

21